**POTATO CHIP INSTITUTE, a Corporation, and Weaver Potato Chip Co., Inc., a Corporation, Plaintiffs,**

v.

**GENERAL MILLS, INC., a Corporation, Defendant.**

**Civ. No. 1585 L.**

United States District Court,
D. Nebraska.

Oct. 13, 1971.

Melville Ehrlich, Washington, D. C., and Lloyd J. Marti, Lincoln, Neb., for plaintiffs.

Dean A. Olds, Richard H. Compere, Hume, Clement, Hume & Lee, Chicago, Ill., Robert M. Spire, Ellick, Spire & Langdon, Omaha, Neb., and Robert R. Heer, Minneapolis, Minn., for defendant.

## MEMORANDUM OF DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

URBOM, District Judge.

The pivotal issue is whether labeling or advertising a product as "potato chips" tends falsely to describe or represent the product when it has been fashioned from dried potato granules rather than from sliced raw potatoes. Following five days of extensive presentation of evidence, careful briefing by counsel, and oral arguments, this court concludes that such labeling and advertising do not tend falsely to describe or represent the product if the labeling and advertising are accompanied by a prominent declaration that the product is made from dried or dehydrated potatoes.

Action for an injunction was begun under the act of Congress known as the Lanham Act, 15 U.S.C.A. § 1125, applicable portions of which are:

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods * * *, or any container * * * for goods * * * any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods * * * to enter into commerce, and any person who shall with knowledge of the falsity of such * * * description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person * * * who believes that he is or is likely to be damaged by the use of any such false description or representation."

The plaintiff Potato Chip Institute, hereinafter referred to as PCI, is a nonprofit corporation duly organized and existing under the laws of Ohio and was such at the time of commencement of the action on September 26, 1969. PCI derives a substantial portion of its income from dues paid by its members, including the plaintiff Weaver Potato Chip Co., Inc., hereinafter referred to as Weaver. Members of PCI represent and at the time of beginning this lawsuit represented the major portion of the domestic production of potato chips and sell their potato chips in every state of the continental United States. Weaver is a Nebraska corporation incorporated July 11, 1947, having its principal place of business and its factory for the manufacture of potato chips and snack foods in Lincoln, Nebraska, and sells and since July 11, 1947, has sold potato chips to wholesalers, jobbers and retailers located in Nebraska, South Dakota, Iowa, Missouri, Kansas and Colorado. PCI has spent large sums of money in the promotion of the sale and use of potato chips, and Weaver has spent large sums of money in the promotion of the sale and use of its brand of potato chips.

For many years—direct evidence traces only approximately the last forty years, although some of Weaver's advertising suggests one hundred years—the conventional manner of making potato chips has consisted of peeling, washing and slicing of raw potatoes, then dipping into deep fat the slices of raw potato until they are cooked crisp, and then removing the slices from the deep fat, drying and salting them. The result has been a thin, crisp, essentially round and somewhat curled piece of potato.

Since 1940 there have been numerous changes in the processes for producing potato chips, such as: (1) the development of new potato varieties with improved storage characteristics and dis-

ease resistance; (2) improved cultural control of potatoes to ensure uniform potato maturity; (3) improved storage conditions for potatoes including the circulation of sulfur dioxide and carbon dioxide to inhibit decay; (4) improvements in the peeling of potatoes including steam peelers and automatic abrasion peelers; (5) improved slicing techniques including the development of the Urschel slicer; (6) improved washing techniques including the use of washing agents such as sodium bisulphite, sodium citrate, or citric acid to enhance uniform chip color; (7) improvements in excess water removal including air conduction blowers and absorbent rollers; (8) improved cooking procedures including microwave drying, infrared drying and hot air drying; (9) improved oil technology; (10) improved flavor treatment and development of specialty flavors such as onion, garlic and bar-b-que flavors; (11) improved packaging materials including polymer coated packages and nitrogen packing. With the possible exception of homemade potato chips, most potato chips made today utilize different manufacturing techniques and finishing techniques than were used for potato chips in 1940. As an association, PCI has encouraged the development of new techniques in the storage, processing, finishing and packaging of potato chips by its members and through the technological improvement committee of the PCI members of the PCI receive information as to new developments in the manufacture of potato chips. Members of the purchasing public have readily accepted the numerous improvements made in the manufacture of potato chips over the period of the past three decades as evidenced by the growing sales of potato chips over said period.

The defendant, hereinafter referred to as General Mills, is and at all times material herein has been a Delaware corporation doing business throughout the continental United States and elsewhere. In September, 1967, General Mills commenced manufacturing and selling a product branded as CHIPOS, which contained, among other ingredients, rice flour and dehydrated potatoes, and which was designated on the containers as "potato chips" and sold and promoted as "potato chips" until March, 1968. PCI, at least as early as March 19, 1968, complained to General Mills about the use of the words "potato chips" in the labeling, sale and promotion of said product, and again complained to General Mills on June 3, 1968; and at least as early as March 28, 1968, and again on June 7, 1968, complained to the Food and Drug Administration about General Mills' use of the words "potato chips" in connection with said product. General Mills last shipped cases of the rice/potato CHIPOS in November, 1968, and thereafter the inventories of CHIPOS in retail stores were sold out. General Mills then revised the formulation of CHIPOS and in April of 1969 introduced CHIPOS "New Fashioned Potato Chips" in test markets in four major cities in the United States including the Omaha-Lincoln, Nebraska, test market. The ingredients of the April, 1969, CHIPOS product are substantially identical to the present CHIPOS product and contain dehydrated potato granules as the principal ingredient.

CHIPOS are made from potatoes cooked, mashed and dehydrated, resulting in potato granules which are later moistened, rolled out, cut into pieces and fried. More specifically, in making CHIPOS the potato cells are initially obtained by the defendant in a dehydrated form of potato granules, the granules and an appropriate amount of water are then introduced into an enrober, a revolving cylindrical container set at an angle very much like a cement mixer, which tumbles the granules in water to wet the granules; an appropriate amount of invert sugar is then added; after appropriate mixing, the melted granules are compacted by a screw-driven extruder operated at a little above room temperature and at about 1,000 pounds per square inch pressure; the extruded pieces are then rolled onto a sheet, one side of which has a waffle

pattern; this sheet is fed into a roller cutter and pieces are cut from it; the pieces are then deep fat fried in vegetable oil at a specified temperature for fifteen seconds; and the pieces are then dusted with salt and, in some cases, with flavors such as barbecue or sour cream and onion. General Mills is presently selling and distributing CHIPOS throughout many portions of the continental United States.

On July 8, 1969, the Food and Drug Administration issued a policy guideline No. 7210.2 relating to the use of the term "potato chip" on products containing dehydrated potato ingredients.[1] The guideline was issued as a result of a conference between representatives of the Food and Drug Administration and of Procter & Gamble, the maker of "Pringle's," which is made from dehydrated potatoes much as CHIPOS. Whereas the previous position of the Food and Drug Administration had been that potato chips, to be labeled as such, needed to be thin slices of raw potato, its guideline No. 7210.2 announced that it would "not consider the words 'potato chips' misleading in the name of an article made from dried potatoes and only such other ingredients as are used in traditional potato chips, *provided the name is accompanied by a prominent declaration that the article is made from dried (or dehydrated) potatoes.*" A part of the presentation to the Food and Drug Administration was a consumer survey to the effect that 98 per cent of the persons interviewed indicated that they had not been deceived by the use of the words "potato chip" to describe Pringle's, following the consumer's awareness of the manufacturing process.[2]

The CHIPOS product, marketed by the defendant beginning in April, 1969, was packaged in boxes which stated on the front panel:

CHIPOS

NEW FASHIONED
POTATO CHIPS
FLASH FRIED [3]

Commencing approximately in October, 1969, General Mills modified its CHIPOS packages, so that they read on the front panel as follows:

CHIPOS

NEW FASHIONED
POTATO CHIPS
FASHIONED FROM DRIED POTATO
GRANULES
FLASH FRIED [4]

The words "FASHIONED FROM DRIED POTATO GRANULES" are in smaller letters than any of the other portions of the legend and are approximately 3/16ths of an inch in height. The words "POTATO CHIPS" are about 7/8ths of an inch in height.

In about March, 1971, General Mills began distributing CHIPOS nationally in slightly modified boxes which retained the legend "FASHIONED FROM DRIED POTATO GRANULES." In July, 1971, General Mills test marketed its sour cream and onion flavor CHIPOS and its barbecue flavor CHIPOS in one city, the packages of which contained the same legend as quoted above but with the additional words "Sour Cream & Onion" or "Barbecue" directly below the word "CHIPOS."

### THE JURISDICTIONAL ISSUE

General Mills has urged this court to find that jurisdiction has not been obtained under 15 U.S.C.A. § 1125, commonly referred as to § 43(a) of the

---

1. The guideline is set out in full in Exhibit 55.

2. The evidence of this survey was received by this court solely for the purpose of showing why the Food and Drug Administration arrived at the conclusion it reached, but the survey was not received and is not considered by this court as substantive proof of the propriety of labeling as "potato chips" any product basically made from dehydrated potatoes.

3. Exhibit 171, a photocopy of the front panel of which is appended hereto.

4. Exhibit 173, a photocopy of the front panel of which is appended hereto.

Lanham Act, because of the plaintiffs' failure to allege and prove that they own a federally registered trademark or to allege and prove that the claim of unfair competition is substantially related to a claim regarding any federally registered trademark of the plaintiffs. Furthermore, it is contended that since the plaintiffs do not have a federally registered mark, they must rely solely upon the theory that section 43(a) creates a federal law of unfair competition that is independent of any trademark registration of the Lanham Act. According to the defendant's brief, the United States Court of Appeals for the Eighth Circuit has held in Fry v. Layne-Western Company, 282 F.2d 97, 99 (1960) and Iowa Farmers Union v. Farmers' Educational & Coop. Union, 247 F.2d 809, 819 (1957) that section 43(a) does not create a federal law of unfair competition which is independent of a federally registered trademark. I do not concur in that analysis.

In *Fry* the issue was limited to whether a common law cause of action for unfair competition arose under any law of the United States, and the court was not confronted with a necessity of deciding whether section 43(a) creates a new cause of action for customer deception or merely codifies existing unfair competition law, and, if the former, whether subject matter jurisdiction lies for an alleged violation of section 43(a) without a concomitant allegation of trademark infringement. Yet those are the issues before this court. The *Iowa Farmers Union* case was not grounded, in part or in whole, on section 43(a), but was a suit to enjoin the infringement of the plaintiff's three trademarks. Consequently, guidances will be sought from those federal courts which have directly dealt with the problem.

The landmark decision[5] construing section 43(a) is L'Aiglon Apparel v.

Lana Lobell, Inc., 214 F.2d 649 (C.A. 3rd Cir. 1954). Following that decision are Gold Seal Company v. Weeks, 129 F. Supp. 928 (U.S.D.C. D.C. 1955), aff'd sub nom. S. C. Johnson & Son, Inc. v. Gold Seal Co., 97 U.S.App.D.C. 282, 230 F.2d 832 (1956), cert. denied 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956); Federal-Mogul-Bower Bearings, Inc. v. Azoff, 313 F.2d 405 (C.A. 6th Cir. 1963); Maternally Yours, Inc. v. Your Maternity Shop, 234 F.2d 538, 545 (C.A. 2nd Cir. 1956), Clark, J., concurring; American Rolex Watch Corp. v. Jack Laufer & Jan Voort, Inc., 176 F.Supp. 858 (U.S.D.C.E.D.N.Y. 1959); Zandelin v. Maxwell Bentley Mfg. Co., 197 F. Supp. 608 (U.S.D.C.S.D.N.Y.1961); Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp., 23 F.R.D. 155 (U.S.D.C.S.D.N.Y.1959); and Midwest Packaging Mat. Co. v. Midwest Packaging Corp., 312 F.Supp. 134 (U.S.D.C.S.D. .Iowa 1970).

Judge Hastie, speaking for the circuit court in L'Aiglon, rejected the notion that section 43(a) merely formalized existing decisional law represented by Mosler Safe Co. v. Ely-Norris Safe Co., 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578 (1927) and American Washboard Co. v. Saginaw Mfg. Co., 103 F. 281 (C.A. 6th Cir. 1900) and observed:

" * * * We find nothing in the legislative history of the Lanham Act to justify the view that this section is merely declarative of existing law. Indeed, because we find no ambiguity in the relevant language in the statute we would doubt the propriety of resort to legislative history even if that history suggested that Congress intended less than it said. It seems to us that Congress has defined a statutory civil wrong of false representation of goods in commerce and has given a broad class of suitors injured or likely to be injured by such wrong

---

5. The relatively small number of cases coming within the purview of Section 43(a) of the Lanham Act has been the subject of scholarly comment. See Dole, "The Emergence of Deceptive Advertising as a Group Tort: A Possible Consequence of the 1966 Federal Rule Amendment with Respect to Class Actions," 62 NW.U.L. Rev. 661, 670–676 (1967), and "Developments in the Law—Competitive Torts," 77 Harv.L.Rev. 888, 907–908 (1964).

the right to relief in the federal courts. This statutory tort is defined in language which differentiates it in some particulars from similar wrongs which have developed and have become defined in the judge made law of unfair competition. Perhaps this statutory tort bears closest resemblance to the already noted tort of false advertising to the detriment of a competitor, as formulated by the American Law Institute out of materials of the evolving common law of unfair competition. See Torts Restatement, Section 761, supra. But however similar to or different from pre-existing law, here is a provision of a federal statute which, with clarity and precision adequate for judicial administration, creates and defines rights and duties and provides for their vindication in the federal courts. * * * "

■ I concur with Judge Youngdahl's conclusion in Gold Seal Company v. Weeks, supra, that " * * * Section 43 (a) does create a federal statutory tort, *sui generis* * * *." [6] Section 43(a) is not dependent upon an allegation that the plaintiffs own a federally registered trademark nor does it require that a case arising under this section be substantially related to a claim regarding any federally registered trademark. Glenn v. Advertising Publications, Inc., 251 F.Supp. 889 (U.S.D.C.S.D.N.Y.1966). Although authority on this question of law is in apparent conflict, I conclude that the minority position found in Chamberlain v. Columbia Pictures Corp., 186 F.2d 923 (C.A. 9th Cir. 1951) and Samson Crane Co. v. Union Nat. Sales, 87 F.Supp. 218 (U.S.D.C.Mass.1949), aff'd 180 F.2d 896 (C.A. 1st Cir. 1950), which perpetuate the American Washboard Co. v. Saginaw Mfg. Co., supra, decision are not consonant with the legislative history of section 43(a) or the literal words found in that statute. In my view, such a limitation is unnecessary, unwarranted and has received little acceptance by later court decisions.

## THE SUBSTANTIVE ISSUE

To be entitled to injunctive relief the burden is upon the plaintiffs to show by a preponderance of the evidence:

(1) the use by the defendant in connection with CHIPOS of a false description or representation, which may include words or symbols tending falsely to describe or represent CHIPOS;

(2) the causing by the defendant of CHIPOS to enter commerce;

(3) the reasonable belief of the plaintiffs that they are or are likely to be damaged by the use of such false description or representation.

■ Element (3) properly may be considered *a matter of standing to sue*, rather than an element of the substantive claim for relief, but in either event it has been established. Dues collected by the plaintiff PCI are reflective of the amount of potato chips sold by its members and the amount of sales by the members, including the plaintiff Weaver, is likely to be lessened by the advertising of CHIPOS as potato chips. See Mutation Mink Breeders Association v. Lou Nierenberg Corp., 23 F.R.D. 155 (U.S. D.C.S.D.N.Y. 1959).

■ Element (2) has been shown by the already extensive sales of CHIPOS by the defendant in several states of the country and by the defendant's intention to continue in that activity.

As to element (1), the plaintiffs claim basically that the words "potato chip," when used together, have acquired by long usage a specific and exclusive meaning: a thin slice of raw potato fried in deep fat until crisp. Relied upon are (a) evidence that for many years the manufacturing process has been precisely within this meaning, (b) dictionary

---

6. See generally, Derenberg, "Federal Unfair Competition Law at the End of the First Decade of the Lanham Act: Pro- logue or Epilogue?", 32 N.W.U.L.Rev. 1029 (1957).

definitions, (c) a survey of persons in Lincoln, Nebraska, and (d) declarations by the Food and Drug Administration.

Until about 1965 potato chips were manufactured only with raw potatoes as the prime ingredient. The consuming public, therefore, had no basis for reading into the words "potato chip" any other manufacturing process. The plaintiffs' survey,[7] although not geared to a clear uncovering of whether people may be misled by an application of the words "potato chip" to a dehydrated potato product, does suggest that most people in Lincoln, Nebraska, select, when limited to a single definition, one specifying raw potatoes. The responses were probably typical of consumers elsewhere. However, a survey conducted for the defendant in Denver, Seattle, Indianapolis and Detroit indicated that 94 per cent of the consumers interviewed, after tasting CHIPOS and being shown a commercial package of CHIPOS, said that they were not misled by having CHIPOS called a potato chip.

The words "potato" and "chip" analyzed separately mean a thin, crisp piece of food made of potato. In juxtaposition to form a term they permit an interpretation limited by the experience of consumers of products known by that name. That experience until 1965, at least, was entirely, and since then has been largely, associated with raw potatoes. Dictionary definitions are reflective of the public's understanding, which undergoes changes from time to time by the varied experiences of the public. Three dictionaries published between 1953 and 1969 define "potato chip" by specifying the use of "raw" potatoes.[8] Typical of these is Webster's New World Dictionary, Unabridged, 1966: "A thin slice of raw white potato fried crisp in deep fat." Ten dictionaries published between 1953 and 1969 omit the "raw" designation.[9] For example, Webster's New Twientieth Century Dictionary, Unabridged, 1964, defines "potato chip" as: "A very thin slice of potato fried crisp and then salted."

Until July, 1969, personnel of the Food and Drug Administration accepted the raw potato concept.[10] In July, 1969, however, the Food and Drug Administration breathed into the term "potato chip" the dehydrated potato manufacturing process under certain conditions, declaring by a policy guideline that use of "potato chip" for a product of dehydrated potatoes would not be considered misleading, if accompanied by a prominent declaration of the basic dehydrated or fried ingredient and if the product is made from dried potatoes and only such other ingredients as are used in traditional potato chips. The insistence upon a declaration acknowledges that without it some misleading might result.

■ I conclude that the phrase "potato chip", standing alone, is a

---

7. The date of the survey is uncertain, but probably was taken in February of 1969 or February of 1970.

8. Webster's New International Dictionary, Second Edition, Unabridged, 1953; Webster's Third New International Dictionary, Unabridged, 1966; and The World Book Dictionary, 1969 Edition.

9. Webster's New Twentieth Century Dictionary, Unabridged, Second Edition, 1964; Webster's New World Dictionary of the American Language, Concise Edition, 1964; Webster's New World Dictionary of the American Language, College Edition, 1953; Funk & Wagnalls New Standard Dictionary of the English Language, 1963; Funk & Wagnalls Standard Dictionary, International Edition, 1969; Funk & Wagnalls Standard College Dictionary, 1968; Readers Digest Great Encyclopedic Dictionary, 1966; and Britannica World Language Edition of Funk & Wagnalls Standard Dictionary, 1966.

10. Several letters from FDA personnel show this view. For instance, Exhibit 3 is a letter to Forget-Me-Not Potato Chip Co., Inc. from John R. Lupien, Assistant to the Director, Division of Case Guidance, Bureau of Regulatory Compliance, stating:

"* * * (W)e agree with your (sic) that the consumer traditionally expects a product labeled as 'potato chip' to be a thin slice of raw whole potato which is deep fat fried."

generic term which is capable of including both chips made of raw potatoes and chips made of dehydrated potatoes, but that the past experience of the consumer so shades the term with a raw potato overlay that the phrase tends to mislead the public and thus falsely to describe a product basically made of dehydrated potatoes.

■ A restricted interpretation of a generic term such as "potato chip" may be expanded, however, by descriptive words. In the present case there are such descriptive words in the General Mills packaging and most of its advertising. Currently, the packages read:

"CHIPOS

NEW FASHIONED
POTATO CHIPS
FASHIONED FROM DRIED POTATO
GRANULES"

The descriptive words, "fashioned from dried potato granules," intercept effectively the reader's tendency to limit the words "potato chips" by past experience with raw potatoes. The interception brings him to the broader, permissible definition of "potato chips." He thus is not misled and the label does not tend falsely to describe or represent.

Some of the television commercials used by General Mills are not so qualified, however. One commercial, known as "Newspaper Sacks" and still in use, and another called "Bags" and until recently in use, contain assertions that CHIPOS are potato chips but employ no prominent declaration that CHIPOS are made from dried or dehydrated potatoes. They, accordingly, tend falsely to describe CHIPOS.

■ The plaintiffs also urge that ingredients never used in conventional potato chips are used in the manufacture of CHIPOS. I find, however, that the term "potato chips" does not convey to the public an exclusion of these ingredients, and the term does not tend to deceive the public as to ingredients, where, as with CHIPOS, the primary ingredient is potatoes.

In arriving at my decision I rely in no way upon the pleaded defense of estoppel.

RELIEF

■ It follows that I must deny the plaintiffs' broad request that the defendant be enjoined from advertising or otherwise promoting the sale of CHIPOS by the use of the words "potato chips" in such advertising and from selling or distributing CHIPOS in packages or containers on which CHIPOS are referred to as "potato chips," but that an injunction should issue:

1. Permanently enjoining the defendant from advertising or promoting the sale of CHIPOS through the television commercials "Bags" or "Newspaper Sacks" or any other advertising employing the words "potato chips" without an accompanying prominent declaration that CHIPOS are made from dried or dehydrated potatoes;

2. Permanently enjoining the defendant from selling or distributing CHIPOS in packages or containers on which CHIPOS are referred to as "potato chips" without an accompanying prominent declaration that CHIPOS are made from dried or dehydrated potatoes.

It is to be understood that I find that the commercial known as "Revolutionary" does contain such prominent declaration; that the commercials known as "Bags" and "Newspaper Sacks" do not contain such prominent declaration in the form viewed by the court at the trial; that the commercial titled "Duo" does contain such prominent declaration; that the boxes in evidence as Exhibits 171 and 172 do not contain such a prominent declaration; and that each of the boxes in evidence as Exhibits 173, 174, 175, and 176 does contain such a prominent declaration.

An appropriate judgment will be entered today.

**CHIPOS**
new fashioned
**potato chips**
FLASH // FRIED

**BETTY CROCKER COUPON**
**GOOD TOWARD**
• STAINLESS FLATWARE    • BETTY CROCKER
  and COOKWARE            COOKBOOKS
• SILVERWARE             • KITCHEN TOOLS
• DINNERWARE             • CUTLERY

PRICE

**CHIPOS**
new fashioned
potato chi
FLASH // FRIED

**CHIPOS ARI**
**GUARANTEE!**
**TO SATISFY**

In this box of Chipos we pro
you the finest flavor, the fre:
product, the greatest taste
fewer broken chips than in
potato chip you've ever eat
    If, for any reason, you are
satisfied with this packag
Chipos, please mail the boxtc
        General Mills, Inc.
           Dept. 200
        400 2nd Ave. South
     Minneapolis, Minn. 55
    The purchase price wil
refunded promptly.

This package is sold by wei
not volume. You can be ass
of proper weight even tho
some settling of contents
mally occurs during ships
and handling.

**INGREDIENTS**
Dehydrated Potatoes, Veget;
Oil, Salt, Invert Sugar, Mono
Diglycerides, and Sodium Ph
phate. Freshness preserved
Sodium Sulfite, BHT, BHA, (
Citric Acid.

**GENERAL MILLS, INC.**
General Offices
Minneapolis, Minn. 55440
Made in U.S.A.
NET WT 141 gms

ET WT 5 OZ

EX. 171

K

PRICE

**NEW**

**CHIPOS**
new fashioned
potato chips

[A4473]

[A4472]