EASTERN AIR LINES, INCORPORAT-
ED, Plaintiff,

v.

NEW YORK AIR LINES, INC., and
Chiat-Day, Inc., Defendants.

No. 82 Civ. 7049(MP).

United States District Court,
S.D. New York.

March 21, 1983.

Addendum April 20, 1983.

Parker, Auspitz, Neesemann & Delehanty by Carroll E. Neesemann, Kim J. Landsman, New York City, for plaintiff.

Blum, Kaplan, Friedman, Silberman & Beran by Lawrence Rosenthal, Laura Goldbard, New York City, for defendant N.Y. Air Lines.

Skadden, Arps, Slate, Meagher & Flom by Joan M. Secofsky, New York City, for defendant Chiat-Day, Inc.

### OPINION

MILTON POLLACK, District Judge.

This is an action to enjoin New York Air Lines, Inc. and Chiat-Day, Inc. from deceptive advertising and from infringing Eastern Air Lines' registered service mark, "Air-Shuttle," which Eastern has used continuously and advertised extensively since 1961 in connection with a distinctive air service between New York and Washington, D.C. and between New York and Boston. Allegedly, defendants have infringed Eastern's registered service mark and have misled or confused the public by using the words "air shuttle" and "shuttle" in extensive advertising in the New York City Metropolitan Area to describe alleged air service in direct competition with Eastern's "Air-Shuttle."

The claims asserted by Eastern Air Lines ("EAL") are based on: (1) Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), claiming that New York Air's ("NYA") exploitation of the widespread recognition of the term "Air-Shuttle" constitutes trademark infringement and unfair competition; (2) Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), claiming that New York Air's advertising was false and misleading in both its use of the word "shuttle" and in its use of certain price figures; (3) common law claims of unfair competition and service mark infringement; (4) Section 349 of New York's General Business Law, claiming deceptive acts; (5) Section 350 of New York's General Business Law, claiming false and misleading advertising; and (6) Section 368–d of New York's General Business Law, claiming dilution of the distinctive quality of a registered and a common law service mark.

New York Air has counterclaimed and alleges that EAL fraudulently procured the trademark "Air-Shuttle" and that it is void.

EAL's claims fall into three categories: Claims of trademark infringement, claims of misappropriation of commercial good will, and claims of false advertising.

For the reasons set forth hereafter, EAL is entitled to a measure of injunctive relief.

EAL is the owner of two service marks for the name and design "Air-Shuttle" registered in the United States Patent Office on August 9, 1966. In 1961 EAL had instituted a shuttle service between New York City and Washington, D.C. and between New York City and Boston. The distinctive characteristics of that service were: (a) prior to the air controllers' strike in August 1981 (PATCO), seats on air shuttle flights were guaranteed through the provision of back-up extra section aircraft; since the strike EAL has provided back-up extra section aircraft whenever possible (subject to the availability of landing slots); (b) passengers do not make reservations; (c) flights depart every hour on the hour from 7:00 a.m. to 9:00 p.m. on weekdays; (d) tickets may be purchased on-board; and (e) service at LaGuardia Airport is provided from a special Eastern "Air-Shuttle Terminal."

Over the last twenty-two years, EAL's service has evolved from employing Constellations and Electras to Boeing 727's and the A–300 Airbuses. Fifty million passengers have flown on the Air-Shuttle. As part of its efforts to promote the Air-Shuttle, EAL currently sets aside fourteen air-

craft that are dedicated for use on the Air-Shuttle's routes.

In order to guarantee seating, EAL has set aside six back-up aircraft and their necessary crews so that it can provide additional service if there is an unexpected surge in passenger demand. Prior to the recent PATCO Air Traffic Controller labor dispute, EAL stood ready to "roll out an extra section (aircraft)" for even one passenger who could not be accommodated on the scheduled flight. Even after PATCO, EAL has made every attempt to provide a guaranteed seat and succeeds in virtually every instance.

In addition to the aircraft that are solely devoted to the Air-Shuttle, EAL employs nine individuals in Miami, who are responsible for supervising the logistics of operating the Air-Shuttle. They monitor historical patterns of Air-Shuttle use so that they are able to have aircraft and crews in the proper locations when they are needed. Often the Air-Shuttle planners will fly empty aircraft from one Air-Shuttle site to another to insure that it is available for anticipated passenger demand.

Provision of back-up service in the manner described above is not inexpensive. EAL feels that the ease, convenience and reliability of its service attract passengers and justify the expense of the Air-Shuttle operation.

Throughout the twenty-two year period of operation, EAL has aggressively promoted the Air-Shuttle service. In their effort to associate convenience and reliability with the EAL Air-Shuttle in the minds of potential passengers, EAL has spent over $5 million in advertising. At times EAL has stressed certain attributes that it feels epitomize the ease, convenience and reliability that EAL is trying to connote. These include the features mentioned above. By 1980 many passengers in EAL's geographic market, especially those who fly frequently for business purposes, were aware of the EAL Air-Shuttle and its claimed attributes and often made use of the service.

Against this background, in December 1980 New York Air initiated operations as an airline and in particular began competing on the routes serviced by the EAL Air-Shuttle. In part due to air route deregulation, NYA was able to offer frequent service between New York/Newark and Washington and Boston. Initially, NYA held itself out as a lower price alternative to its competitors. The reduction in service mandated by the PATCO labor dispute forced NYA to reconsider its strategy. Under the stewardship of a new Chief Executive Officer, Michael Levine, NYA sharpened its focus and attempted to attract the frequent business traveler who was conscious of price and interested in amenities.

In 1982 NYA implemented this strategy in the New York/Newark, Boston and Washington markets by initiating a comparative advertising campaign, which was admittedly designed in part to woo business away from the EAL Air-Shuttle. NYA employed three different advertising agencies during the period. Until March 31, 1982, advertisements were prepared by the Ketchum Agency in New York; upon termination of the Ketchum account, advertisements were prepared by defendant Chiat-Day until November 9, 1982, at which time Mathieu, Gerfen & Bresner ("MGB") took over as advertising agents. In 1982 alone, over $5.8 million of advertising was placed by NYA. Much of this advertising either referred to the EAL Air-Shuttle by way of comparison or described the New York Air service as a shuttle service.

In order to attract EAL's customers and others, NYA stressed its on-board amenities of free food, drinks and allegedly greater leg room, comfort and attentiveness. Particular advertisements, read ordinarily and not analytically, readily implied that amenities associated with the Air-Shuttle were exceeded by the features to be found on NYA's planes. By employing the EAL Air-Shuttle as a basis for comparison, NYA attempted to benefit from the good will that EAL had generated in the minds of the consuming public with respect to the Air-Shuttle over the previous two decades.

The advertising efforts were designed to convince EAL's customers to try NYA's service. As late as September 1, 1982, Chief Executive Officer Levine instructed his ad-

vertising agency to "Put it to the shuttle," referring to EAL's Air-Shuttle.

NYA has initiated an aggressive and competitive campaign to win over a substantial share of the air travel market in New York City, Washington, D.C. and Boston geographic areas. NYA has chosen to withstand millions of dollars of losses in its long-term attempt to become a viable competitor. NYA's bold and extensive advertising campaign, which is the subject of the dispute in this case, is the vehicle on which NYA relies to establish a significant place in the air travel market.

*Nature of a Trademark*

Analysis of many of Eastern's claims depends upon the characterization to be given to the term "shuttle." Trademarks are classified along the spectrum of increasing strength from generic, to descriptive, to suggestive to arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 587 F.2d 4 (2d Cir.1976).

■ A generic trademark uses a general term which implies reference to every member of a genus and the exclusion of individuating characters; it is "one that refers or has come to be understood as referring to the genus of which the particular product is a species." *Abercrombie & Fitch Co., cit. supra.* Whether the *principal* significance of a term is individual in character, supplies the test whether it is not generic and not whether the public perceives the term as an indication of the nature or class of the article. *Locite Corp. v. National Starch & Chemical,* 516 F.Supp. 190, 199 (S.D.N.Y. 1981), quoting *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 295 F.Supp. 479, 490 (S.D.N.Y.1968) (finding that "Super Glue" was generic). Trademarks that are generic do not have any trademark protection.

A descriptive trademark is one that "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 11. An alternative test asks whether "the word conveys the characteristics, functions, qualities, or ingredients of a product to one who has never seen it and does not know what it is." *Stix, supra,* at 487. A trademark with these characteristics is descriptive. A trademark that is descriptive does not receive the protection of the trademark laws unless it has acquired a secondary meaning. *Abercrombie, supra,* at 10.

■ To acquire secondary meaning, the mark must have as the "primary significance ... in the minds of the consumers ... the identification of the producer, not a designation of the product." *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). The crucial question "always is whether the public is moved in any degree to buy an article because of its source." *Id.*

■ A trademark is suggestive if "it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie, supra* at 11. These trademarks are subject to the trademark laws without proof of secondary meaning. The decision of the United States Patent Office to register a trademark without requiring proof of secondary meaning creates a rebuttable presumption that the mark is suggestive. *Id.*

Fanciful marks are those invented for use as trademarks and arbitrary marks are those where common words are applied in unfamiliar ways. *Id.*

*"Shuttle" is a Generic Word*

■ The testimony of Professor Read, EAL's own expert witness on lexicography, sets forth both the history and present meaning of the words "shuttle" and "air-shuttle" and demonstrates that these terms indisputably describe the nature and class of transportation service that EAL provides and the terms are therefore generic.

The word "shuttle" seems to have had its roots in the German language, according to lexicographers. The Bible had mentioned "a weaver's shuttle." Job VII, 6. The word appeared in Old English before the year 1000 A.D. with a meaning of "to shoot a shot." This meaning disappeared by the year 1000. Its usage appears recorded again in 1338 as a device that moved back and forth in a weaving loom.

Over the next several hundred years, this basic notion of "back and forth" movement

has been applied in a variety of contexts as the usage of the word "shuttle" has developed. For instance, in a creative application of the word, William Shakespeare, in the *Merry Wives of Windsor,* in 1598, wrote that "Life is a shuttle," and Walt Whitman, in the 19th Century spoke of "the musical shuttle" "out of the mockingbird's throat."

By 1891, the application of the term to transportation was well-documented in America. In that year, the Century Dictionary stated that a "shuttle train" was a train that went in one direction, possibly on a little side line, from a station to another little station and back again immediately.

The use of the word in transportation developed, with the word being applied to new modes of transportation as they were invented. Thus, shortly after 1902, the New York Subway system applied the term "shuttle" to its service on 42nd Street connecting the East Side and West Side lines. Similarly, the word became applied to buses as well and "shuttle bus" achieved a well-established meaning as a bus that one could simply get into and be carried for a short distance. As NYA's expert testified, the first references to "shuttle" in the context of aviation or air transportation began apparently in the 1950's. In the Air Force Dictionary, published in 1956, there were references made to "shuttle bombing" and "shuttle raids." In *Roget's International Thesaurus, 3rd ed.,* 1962, at 159, the word "shuttle" appears in the section on aviation as a synonym for the word "flight." In the Fourth Edition of *Roget's,* the term "air shuttle" appears in small letters as a synonym for air travel. *Roget's International Thesaurus, 4th ed.,* 1977, at 187. EAL first applied the term to its air transportation service in 1961.

Professor Read, a noted lexicographer, described this use of the word by EAL as a "specialization" or a narrowing in the meaning of the word. Thus, he asserted that, in the context of air transportation, people use the word to mean a shuttle with the package of features of EAL's service.

While it is clear that the word "shuttle" does have some of the connotations of EAL's service, neither these features nor

EAL itself has become the "principal significance" of the word as required by *Locite, supra.* A shuttle is still viewed as "a train, bus or plane making short, frequent trips between two points." *The American Heritage Dictionary of the English Language* 1969, at 1201.

The fact that the word has certain connotations does not make it any the less generic as these connotations have not altered the primary meaning of the word. As NYA's word expert testified, the development of a specialized meaning does not necessarily encroach upon the general meaning or change it.

■ Even if the word "shuttle" were found to be descriptive instead of generic, the mark would not be entitled to trademark protection as the survey made by EAL failed to show that it has acquired a secondary meaning. Only 10 per cent of the individuals surveyed identified the word "Air-Shuttle" with EAL. Not only is this percentage too insignificant to establish that the primary significance of the term is the producer and not the product, but the mere fact that a respondent mentioned "Eastern" when he heard the word "shuttle" does not suggest that "shuttles" are identified with Eastern. All that it demonstrates is that a likely response to any generic word is the name of the best known producer or manufacturer of that product. This evidence further demonstrates that the term "shuttle" is generic. *See Anti-Monopoly, Inc. v. General Mills Fun Group,* 684 F.2d 1316, 1322–23 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) (finding that " Monopoly" is generic even though over 55 per cent of the public has come to associate the product with the producer Parker Brothers).

The above analysis also supports this Court's conclusion that the term "air-shuttle" is generic. This term is merely the compound form of two generic words, associated to give effect to their generic meaning. Thus, air-shuttle is generic just as air travel is generic. This conclusion is particularly certain in the use of the word "shut-

tle" in combination with "air" as "shuttle" has historically been used in compound form with a word to describe the mode of transportation involved, as in shuttle bus, shuttle train, or space shuttle. Placing a common generic adjective in front of a generic word does not make the word any the less generic, especially when the combination of the terms has both the purpose and effect of describing the genus of which the particular product is a species. In addition, Eastern's survey evidence indicated that the public principally associated the term "air-shuttle" with attributes of the service and not with Eastern. In addition to supporting the finding that the term "air-shuttle" is generic, the survey evidence compels a conclusion that the term has not acquired any secondary meaning. The words that New York Air has been using in its advertising and Eastern's service mark are generic.

*Legal Consequences of Classification as Generic*

EAL claims that NYA has taken the good will embodied in the aura of reliability, ease, and convenience with which EAL has imbued the terms "Air-Shuttle" and "shuttle" through over twenty-two years of organization and expenditure of labor, skill and money. Given this Court's finding that the term "shuttle" was and remains generic, it is necessary to examine precisely the ways, if any, in which NYA's actions unlawfully used EAL's good will and the uses of the word that EAL cannot prevent.

The expenditure of extraordinary efforts and money in the promotion of a generic word does not automatically entitle the investor therein to any protection and does not necessarily create any legally protectable rights. *Anti-Monopoly, Inc. v. General Mills Fun Group,* 684 F.2d 1316, 1322 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). Investment in a trademark that might become generic is at the risk of the user. *Id.* When an advertiser has chosen to invest in

a generic term, it does not acquire that term for its own exclusive use. Judge Friendly has put it clearly:

> . . . no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name.

*Abercrombie, supra* at 9.[1]

The reason that such terms cannot be appropriated is clear. To hold to the contrary would allow the developer of a new product to block competition. As Judge Friendly has also noted:

> To allow trademark protection for generic terms, i.e., names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.

*CES Pub. Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir.1975).

EAL's claim that it has altered the meaning of the word "shuttle" by linking, to its usual connotation of frequent short trips to and fro, the special characteristics that EAL provides does not alter the conclusion that EAL cannot appropriate the term. The Seventh Circuit, in finding that the mark "LITE" was a generic term as applied to diet beer, and thus not subject to trademark protection, noted that "even if Miller had given its light beer a characteristic not found in other light beers, it could not acquire the exclusive right to use the common descriptive word 'light' as a trademark for that beer. Other brewers whose beers have qualities that make them 'light' as that word has commonly been used remain free to call their beer 'light.' Otherwise a manufacturer could remove a common descriptive word from the public domain by

---

1. *See also HMH Publishing Co., Inc. v. Brincat,* 504 F.2d 713, 718 (9th Cir.1974) ("a businessman should not be permitted to 'pluck a word with favorable connotations for his goods or services out of the general vocabulary and appropriate it to his exclusive use no matter how much effort and money he may expend in the attempt.'" (cites omitted)).

investing his goods with an additional quality, thus gaining the exclusive right to call his wine 'rose', his whiskey 'blended' or his bread 'white.'" *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 81 (7th Cir.1977).

■ Thus, the law is clear that EAL cannot claim exclusive use to the word shuttle, even in the sense that it claims that the word has come to be understood. EAL itself appeared to recognize this principle when it filed for the trademark on the word "Air-Shuttle." In that application, it stated that:

> Others continue to have the right to use the words to identify or describe their own goods or services, but owing to the fact that the words of the mark, to a part of the public, mean something else (*i.e.,* AIR SHUTTLE—Eastern Air Lines service), the registrant's competitors are required to accompany their use of the bare words with sufficient explanation or distinguishing marks of their own.... In our present case another operator might refer to his transportation service as a "*shuttle*-type operation" or as "*air*-taxi" or "*air* commuter", but he should be restrained from appropriating the applicant's goodwill by advertising his service as AIR SHUTTLE.

(Exhibits DE and DF, Supplement to Application for Registration on the Principal Register filed December 27, 1965, p. 2.)

NYA has not exceeded the limits as defined by EAL itself. The principal portion of the NYA advertising that uses the word "shuttle" identifies it with NYA's own identifying mark or corporate name. Also, NYA has thus far only described its service as a "shuttle" and not as an "Air-Shuttle," as EAL itself stated would be permissible.

Yet, the principle that all uses of the word "shuttle" by NYA are not prohibited does not mean that NYA can indiscriminately use the word in its advertising. Even though the word "shuttle" is generic, it has come to have certain connotations embedded in the mind of the public through twenty-two years of advertising by EAL, as established by surveys, regarding guaranteed seating, back-up plane service, lack of a reservation requirement, frequent hourly service, on-board ticketing, and a separate shuttle terminal. NYA's use of the word may not be used in any way to mislead the public into believing that NYA also provides these features if it does not. Misleading effects from its advertising could result from either the format of the advertisements or from the absence of disclaimers.

This type of misleading use of a generic term was considered in *Potato Chip Institute v. General Mills, Inc.,* 333 F.Supp. 173 (D.Neb.1971), *aff'd* 461 F.2d 1088 (8th Cir. 1972). In *Potato Chip, supra,* plaintiff, a manufacturer of potato chips from raw potatoes, attempted to enjoin defendant from advertising its potato chips, which were made from dehydrated potatoes, as "potato chips." The Court concluded that the word "potato chip" included both chips made of raw potatoes and of dehydrated potatoes. However, "past experience of the consumer so shades the term with a raw potato overlay that the phrase tends to mislead the public and thus falsely to describe" the product. *Id.* at 181. Consequently, the Court held that, while the plaintiff could not prevent the defendant's use of the generic term "potato chip," the defendant's advertising had to include a "prominent declaration"—in effect a disclaimer—that the defendant's chips were made from dehydrated potatoes. *Id.*

■ Similarly, the generic term "shuttle" is broad enough to cover the service presently provided by both NYA and EAL on their New York/Washington, D.C. service. However, just as potato chips were thought by the public to be made from raw potatoes, so—according to the surveys—the public has come to associate the word "shuttle" with the package of EAL's ease, convenience and back-up features. Thus, indiscriminate and ambiguous use of the word "shuttle" by NYA is susceptible to the same type of claim of misleading advertising that the defendant's use of the term "potato chip" subjected it to in *Potato Chip, supra.* Although a party cannot block others from

using a generic term by investing in that term, neither a court nor a competitor can ignore the effects of such investment on the public's understanding of the term when deciding whether advertising is misleading.

*Misleading Advertising Claims*

EAL's claims of misleading advertising fall into two categories: (1) claims relating to NYA's use of price comparisons that did not indicate with adequate disclaimers that NYA did not have a $45 fare at all times; and (2) claims relating to NYA's use of the word "Shuttle" in light of the fact that NYA service between New York and Washington, D.C. does not have attributes distinct in the usage of the term that the public associates with the word "shuttle."

■ Section 43 of the Lanham Act prevents false descriptions or representations in advertising. This section encompasses more than literal falsehoods and covers the "sophisticated deception" that may be created by "clever use of innuendo, indirect intimations, and ambiguous suggestions." *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir.1978). When challenged advertisements are implicitly rather than explicitly false, the tendency of the ad to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction. *Coca-Cola Company v. Tropicana Products,* 690 F.2d 312, 317 (2d Cir.1982). In particular, the reaction of the "person to whom the advertisement is addressed" and what this person finds "to be the message" of the ad are the proper questions in evaluating whether an advertisement is misleading. *American Home Products, supra* at 166. Thus, survey evidence of members of the targeted consumers is useful to determine the message conveyed by the advertisements. *Id.*

■ A plaintiff may obtain injunctive relief under Section 43 even if it cannot prove that actual sales were diverted from its product. *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 191 (2d Cir. 1980). However, the plaintiff must "offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising." *Coca-Cola, supra* at 316. Market studies that demonstrate that consumers are misled by ads, when products are involved in head-to-head competition, could supply the causative link between the advertising and the plaintiff's potential lost sales. *Coca-Cola, supra* at 317.

*Evaluation of NYA's Advertisements*

EAL introduced survey evidence of the reactions to one set of NYA's advertisements. Five hundred one individuals who had flown between LaGuardia and Washington and/or LaGuardia and Boston at least once during the past three years were interrogated in the survey. The advertisement evaluated in the survey listed, side-by-side, certain features of EAL's and NYA's services from LaGuardia to Washington, D.C. The side describing EAL was headed "What $65 buys on Eastern's shuttle" and lists only "A trip to Washington" followed by a substantial blank space opposite the promotional features of NYA's service. The side describing NYA's service is headed "What $45 buys on New York Air's shuttle" and lists a trip to Washington, flight attendants who attend, extra legroom, an assigned seat, free New York-style food, and free drinks, including a featured red and white wine of the month. In addition, this half of the advertisement lists NYA's flight schedule, details the fares, and informs the reader how to make a reservation.

The surveys have established that this type of advertisement misleads the public by suggesting that NYA furnishes the features of EAL's service as well as additions thereto—clearly an overrepresentation of NYA's service. For example, after the survey participants were shown this type of advertisement and given an opportunity to read it, they were asked whether they thought or were sure that either airline provided certain services. In particular, they were asked "What came closest to [their] understanding of who offers" certain features. The question was put both on the basis of their "understanding of air service between LaGuardia and Washington, as

well as the ad" (Question # 9). Forty-seven per cent of the respondents replied that they were sure or thought that NYA provided a guaranteed seat, with a back-up airplane (to insure transportation compatible with the scheduled departure) in reserve to make sure that everybody gets a seat. In comparison, 53 per cent of all respondents replied that they were sure or thought that EAL provided such service.

In addition, the analysis of the survey answers of frequent travelers (defined as those travelers who had flown between LaGuardia and Washington and/or LaGuardia and Boston four or more times during the past twelve months) indicated that 41 per cent of these individuals were sure or thought that NYA provided a guaranteed seat, while 66 per cent of the more frequent travelers were sure or thought that EAL provided such service.

Contrary to the belief of 47 per cent of the surveyed individuals, induced by NYA's reference to "shuttle" service, NYA does not provide a guaranteed seat with a back-up airplane in reserve.

As described above, EAL undertakes substantial and expensive efforts to assure, and its sales of shuttle service has unquestionably imbued travelers with the characteristics of their service, namely, if they arrive at the EAL Air-Shuttle departure gate a designated amount of time before departure, travelers are guaranteed a seat and transportation back-up leaving at or about scheduled departure time. Although, as already mentioned, recent PATCO labor problems have impeded EAL in its intent and effort to provide such service, EAL's shuttle does manage substantially to guarantee such service as advertised with at most a short delay. NYA does not in fact provide this same feature; the prospective passenger who is unable to obtain a seat on, for example, a NYA flight at 12:00 p.m. will not be furnished back-up service nor necessarily be able to depart on the later 1:00 p.m. NYA flight on which all seats may have been reserved. Thus, NYA in no way provides guaranteed service, or even the qualified guaranteed service necessitated by PATCO.

Another example of the survey evidence of the advertisement's misleading nature is seen in Table 6 of the survey. After viewing the advertisement, individuals were asked whether the statement "New York Air offers all that Eastern offers, plus more" was conveyed by the ad. Ninety-one per cent of all respondents and 94 per cent of the more frequent fliers replied in the affirmative that this was the impression NYA conveys. This impression is clearly deceptive as NYA does not provide all that Eastern offers; it does not provide the guarantee of a trip at departure time or within a short interval of a traveler's arrival at the airport. This feature of shuttle service as conveyed to the riding public over the years is clearly a significant aspect of air travel and the fact that the advertisement suggests that NYA provides all the affirmative associations that the term shuttle has come to connote on EAL's Air-Shuttle shows that the advertisement is clearly misleading.

■ Thus, it is well established by the canvas of the public that the type of advertising used by NYA that was the subject of the survey is misleading and thus liable to an injunction.

An examination of the history of the type of advertisement referred to indicates that there is a risk and likelihood that NYA will run the $65–$45 advertisement in the future, or its equivalent, and that an injunction is thus proper; the lip-service to the contrary is not persuasive in light of the evidence.

At a September 1, 1982 meeting, Mr. Levine instructed NYA's advertising agency to design an ad that dramatized the differences between NYA's service and that of EAL in a direct, comparative way. The $65–$45 ad was designed in response and ran from September 22, 1982 to early or mid-November 1982.

The copywriter and co-creator of this ad testified that the word "shuttle" had been used in the ad to convey *parity* in terms of frequency and convenience. This clear evi-

dence of intent to link NYA to the features affirmatively associated with EAL through the use of the word "shuttle" and through a direct, comparative format, in combination with NYA's expressed intent to use its ads to "put it to the Shuttle," makes the offer of NYA that it will not again use the ad, or one essentially equivalent to it, not reliable.

No survey evidence was presented regarding any of the other types of advertisements run by NYA, and there is no way for the Court to determine whether those ads are similarly misleading the users of the airline. The mere occurrence of the word "shuttle" in the ads that were not the subject of surveys and in the ad that was the subject of the survey is not enough to establish that the ads that were not the subject of surveys were misleading. The type of ad that was the subject of the survey had a distinctive format, highly comparative in nature. It is not possible to ascertain whether the public's perception of NYA's purported shuttle service as a result of that ad was formed solely by NYA's use of the word "shuttle" to describe both services or whether it also was formed by the unique format.

The Court is not holding that an advertisement that NYA may use in the future that employs the word "shuttle" without the comparative format of the survey ad will not be improper. Such a publication, if made, will need to be considered at the appropriate time. It is certainly possible that the strong connotations that the word "shuttle" has come to have in the mind of the public will make it improper for NYA to use this word in its advertisements without appropriate disclaimers. The Court, however, does not intend this statement to be construed as an invitation to EAL to litigate whenever NYA runs an advertisement using the word "shuttle." Nor is this statement to be construed as a license to harass NYA in its efforts to develop its image and increase its share of the air travel between New York and Washington.[2]

**2.** Peculiarly, there was no evidence that NYA's terminal, baggage room or timetables employ the word "shuttle" to indicate such service.

*Misappropriation*

There are two possible bases for EAL's further claim that NYA's use of the word "shuttle" goes beyond deceptive advertising and unfairly trades on the commercial good will that EAL has built up over time: the *Standard & Poors v. Commodity Exchange,* 683 F.2d 704 (2d Cir.1982) theory and the New York Anti-Dilution Statute, Section 368–d of New York's General Business Law.

In *Standard & Poors, supra* at 710, the Court of Appeals noted that the essence of a claim of misappropriation is " 'endeavoring to reap where [one] has not sown;' ... taking 'the skill, expenditures and labors of a competitor' and 'misappropriati[ng] for the commercial advantage of one person ... a benefit or "property" right belonging to another.' " In that case, the Court emphasized that Standard & Poors undertook substantial and continuing efforts to devise the index that the defendants were using.

There is an essential difference between NYA's use of the word "shuttle" and the use of the Standard & Poors index. In the present case, all that NYA can be claimed to be taking is the idea of the product—convenient flight service. NYA is not using the continuing labors of EAL but must spend its own time and efforts to develop an image of convenience and frequent service for itself. In *Standard & Poors, supra,* the defendants' use of the index directly and substantially saved defendants the need to create and calculate an index of their own.

In *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), in which the Supreme Court enjoined the defendant from copying the news stories on AP bulletin boards, the misappropriation claim related to taking the work that the plaintiff was doing. The defendant was not enjoined from running a news service based upon its own labors. The analogy of *Standard & Poors, supra,* or

Query whether its ads are factual at all in using a reference to a shuttle?

*International News Service, supra,* might apply if, for example, NYA had pirated EAL's developed data and formulae on when back-up flights would be needed. The mere use by NYA of a generic word that may have positive public recognition when associated with another airline does not, however, amount to misappropriation.

EAL has also failed to make out a claim under Section 368–d of the New York Anti-Dilution Act. That Act provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of confusion as to the source of goods or services.

The interest protected by this statute includes the "selling power that a distinctive mark or name with favorable associations has engendered in the mind of the consuming public." *Sally Gee, Inc. v. Myra Hogan, Inc., et al.,* 699 F.2d 621 (2d Cir.1983) at 1637. EAL claims that NYA's use of the word shuttle dilutes the value of the mark to EAL. However, New York law requires that the mark in question be strong in order to state a claim for anti-dilution relief. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977) ("Allied" was a weak trademark, either generic or descriptive without secondary meaning, and thus not susceptible to dilution.).

EAL thus fails to make out a claim of dilution under state law since the Court has found that "shuttle" is generic.

## Miscellaneous Remaining Claims

None of the remaining grounds on which EAL seeks relief have been established. While EAL seeks relief under N.Y. Gen.Bus.Law § 350, regarding false advertising, this section does not provide a private cause of action. *Quinn v. Aetna Life & Cas. Co.,* 482 F.Supp. 22, 28 (E.D.N.Y. 1979), *aff'd,* 616 F.2d 38 (2d Cir.1980). EAL also states a claim in its complaint under New York's General Business Law Section 349, regarding deceptive acts or practices. As EAL has not established that any advertisement or type of advertisement other than that already to be enjoined is misleading, this Section provides no basis for additional relief. Finally, EAL did not show that the use of the word "shuttle" by NYA in any way confused the public regarding the sponsorship of the service provided by NYA or regarding any endorsement of it by EAL. EAL also has failed to show that NYA's use of the word "shuttle" in any way tarnishes the reputation or image of EAL or its shuttle service. Thus, even if the word "shuttle" were not generic, no valid Lanham Act Section 32(1) trademark infringement claim has been established.

## NYA's Counterclaim for Cancellation of EAL's Service Mark

The counterclaims of NYA for the cancellation of EAL's service marks are dismissed. The Court declines to exercise its discretionary equitable authority under all the facts and circumstances of this case. In addition, NYA's counsel stated at the conclusion of the trial that if his "client is permitted to use the word 'shuttle,' [he] care[d] not a whit what happen[ed] to the registration." Transcript p. 483. As the Court is not preventing nonmisleading use of the word "shuttle," and as NYA is allowed to use the word "shuttle" to the full extent that it would be allowed to use the word if the mark "Air-Shuttle" were to be canceled, the counterclaim is accordingly dismissed.

## Claims Against Chiat-Day

The complaint against defendant Chiat-Day has become moot by termination of its services for NYA.

## Conclusion

Accordingly, a decree may be submitted, on notice, enjoining NYA from in any way, without appropriate disclaimers or unambiguous use of the term "shuttle," advertising or promoting NYA air services hereafter, directly or by comparisons, so as to

incorporate the features of EAL's shuttle service that NYA does not provide.

Judgment for the plaintiff accordingly, with costs.

The foregoing shall constitute the findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

SO ORDERED.

### ADDENDUM

Our attention has been called to a statutory amendment of New York General Business Law § 350–d(3) (McKinney's 1980) which obsoleted the ruling in *Quinn v. Aetna Life & Cas. Co.*, 616 F.2d 38, decided January 28, 1980 by the Second Circuit Court of Appeals, that "the General Business Law's strictures on false advertising ... may only be enforced by the State Attorney General." *Id.* 41. The amendment, effective June 19, 1980, added § 350–d and provided that "Any person who has been injured by reason of any violation of [the laws against false advertising] may bring an action to enjoin such unlawful act and practice and to recover his actual damages or fifty dollars, whichever is greater," (etc.).

Accordingly, so much of the Opinion of March 21, 1983 as relies on *Quinn* is withdrawn and in connection with the bifurcated damage phase of the case, Eastern shall be free to show any damage to which it believes it is entitled under the said statutory amendment.

SO ORDERED.